## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>PEOPLE OF THE VIRGIN ISLANDS,    )<br>      )<br>v.    )<br>      )<br>RAHEEM LOUIS,    )<br>      )<br>    Defendant.    )<br>_____) | **Criminal Action No. 2011-023** |

**Attorneys:**
**Alphonso Andrews, Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
> *For the United States and the Virgin Islands*

**Yvette Ross-Edwards, Esq.,**
St. Croix, U.S.V.I.
> *For the Defendant Raheem Louis*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Raheem Louis' Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, pursuant to Fed. R. Crim. P. 29(c) and (d). (Dkt. No. 100). For the reasons that follow, the Court will deny the Motion.

## I.       BACKGROUND

Defendant Raheem Louis ("Defendant") and his twin brother, Kareem Louis ("Kareem"), were indicted in October 2011 on charges of aiding and abetting carjacking, pursuant to 18 U.S.C. § 2119 (Count One); robbery first degree, pursuant to 14 V.I.C. § 1862(2) (Count Four); unauthorized use of a vehicle, pursuant to 14 V.I.C. § 1382 (Count Seven); and possession of stolen property, pursuant to 14 V.I.C. § 2101(a) (Count Eight). Following a five-day trial in December 2011, a jury found Defendant guilty on all four counts. Defendant timely filed his

Motion for Judgment of Acquittal or for a New Trial, challenging his convictions of carjacking and robbery in the first degree. The United States opposed Defendant's Motion. (Dkt. No. 102).

The following evidence was elicited at trial. On August 19, 2011, at approximately 8:30 a.m., Eliza Schierloh arrived at work at the Animal Shelter/Flea Market in Christiansted. (Trial Transcript, Dkt. No. 67 at 126). She testified that two young men approached her, and one of them asked for a cigarette. She recognized the young man who asked for the cigarette because he had previously asked her for cigarettes, and he lived in the white concrete house next to the Flea Market. *Id.* at 125.  She recalled that the other man was wearing a dark blue or black wool jacket. *Id.* at 126. Ms. Schierloh saw the men walk back toward the white concrete house. *Id.* at 129. Virgin Islands Police Department ("VIPD") Officers Rolando Huertas and Orlando Benitez, Jr. testified that Defendant and his twin brother Kareem lived in that structure. (Trial Transcript, Dkt. No. 93 at 27, 125).

Ms. Schierloh proceeded to open the Flea Market. (Dkt. No. 67 at 127). She saw a car heading to the loading dock at the side of the building where donations are collected. *Id.* at 128. Less than a minute later, she saw the back of the man wearing the black jacket as he walked around the corner of the building toward the loading dock. *Id.* at 128-129. Ms. Schierloh then saw a car coming out from the loading area at a very high rate of speed. *Id.* at 129. Another Flea Market employee, William Martinez, who had been in the receiving area to take the donations, told her to call 911 because the car had been stolen. *Id.* at 130. Ms. Schierloh unsuccessfully attempted to call 911. *Id.*

Miriam Euzebe testified that, at approximately 8:30 on the morning of April 19, 2011, she arrived at the Flea Market in her 2010 blue Jeep Compass to donate some items. She reversed the car into the loading area, opened the trunk, and gave the donated items to the

gentleman at the receiving area. She shut the trunk and, while walking back around the jeep, she noticed two young men coming towards her. *Id.* at 82-86, 109. One of the men placed a long-barreled handgun to her forehead and demanded her car keys. She heard a click. The second person stood directly behind the first person and did not speak. Fearing for her life, she gave the man her keys and took cover behind a nearby dumpster. *Id.* at 87-88. She stated that no one else, other than those two men, was around at the time of the incident. *Id.* at 113. When she heard the jeep pull away, she came out from behind the dumpster. She called out to the gentleman who had received the goods that two guys had just stolen her car. Ms. Euzebe described the men as five feet seven or eight inches tall; she was four feet nine inches. She went to the nearby police station in Basin Triangle and gave a statement. *Id.* at 87-90. She testified that she had left her Apple i-Phone in the car. *Id.* at 92.

Shamar Browne, Defendant's fourteen-year old brother who lived with his father in Catherine's Rest, St. Croix, testified that, on the morning of August 19, 2011, sometime after 8:30, Defendant and Kareem arrived at Shamar's father's house in a small blue jeep. *Id.* at 141-143. Shamar stated that Defendant was wearing a black winter jacket when he arrived at the house. Shamar identified the jacket from a photograph that the VIPD had taken of the inside of the jeep after the jeep had been recovered. *Id.* at 156-157. Shamar and his thirteen-year old brother Oshean left the house and rode in the jeep with Defendant and Kareem to the Catherine's Rest Supermarket. Defendant told Shamar that he and his girlfriend had "patch[ed] up" money to buy the car. *Id.* at 145. Oshean Browne testified that, on the second of the three trips to the Supermarket, Defendant drove the jeep. *Id.* at 168-169.

Meanwhile, Ms. Euzebe happened to be traveling in the Catherine's Rest area and saw her jeep enter the parking lot of the Catherine's Rest Supermarket. *Id.* at 94-95. The windows

were down and she saw two people in the front and one person in the back. *Id.* at 96. She recognized the person who exited the car as the man who had put the gun to her head earlier that morning, and she alerted the police. *Id.* at 97-98.

Video footage entered into evidence showed that the blue Jeep Compass made three trips to the Supermarket that morning. Gov't Exs. 20B1, 20B2, 20B4. Shamar and Oshean Browne testified that, on the last trip to the store with Defendant and Kareem, police cars pulled in front of the jeep and Kareem ran out of the car. The police ordered him to "freeze" but he kept running. Defendant drove off fast and dropped Shamar and Oshean at their father's house. *Id.* at 147-148, 170-172. During that trip to the father's house, Defendant told Shamar that he was sorry for getting him and his brother "in this mess." *Id.* at 150.

VIPD Officer Rolando Huertas testified that he received radio transmissions about a possible stolen vehicle spotted at Catherine's Rest Supermarket. (Dkt. No. 93 at 7). He arrived at the Supermarket and saw the vehicle parked in the parking lot. Officer Huertas observed Kareem exit the vehicle. He also recognized Defendant as the driver of the jeep, and he saw two young men in the back. *Id.* at 13-15. He approached the jeep, saying "Police. Stop." The vehicle drove off. *Id.* at 14-15. Officer Huertas turned his attention to Kareem, who took off running. During the chase, Officer Huertas saw Kareem pull out what appeared to be a firearm from his waist and hide behind a garbage bin. Officer Huertas eventually apprehended Kareem and found a weapon in the area near the garbage bin. *Id.* at 15-17, 21. Mrs. Euzebe testified that the recovered firearm resembled the one that was pointed at her earlier that morning. (Dkt. No. 67 at 88).

After a high-speed chase later that day, VIPD Officer Luis Cedano recovered the blue Jeep Compass, which had been abandoned in some bushes by the side of the road. (Dkt. No. 93

at 85-87). The officers found, *inter alia*, a "black thick heavy coat" in the back seat of the jeep. (Dkt. No. 67 at 48-49).

Defendant was arrested on September 1, 2011 at his residence. (Dkt. No. 93 at 124-25). He was searched and an Apple i-Phone was recovered from his front pocket. *Id.* at 27. When asked to whom the i-Phone belonged, Defendant first responded that it was his. When he learned that the Officers were going to check the phone's serial number, Defendant told Officer Benitez that the phone belonged to "the owner of the vehicle which they stole, the blue Compass." *Id.* at 130-131, 134. Defendant also asked Officer Benitez to erase the pictures on the phone. *Id.* at 126. Ms. Euzebe testified that the phone "looked exactly" like her i-Phone, although she could not verify that it was hers because the battery was dead. (Dkt. No. 67 at 92-93).

## II.     DISCUSSION

### A.  Motion for Judgment of Acquittal

#### 1.  Legal Principles

Federal Rule of Criminal Procedure 29 provides that "the Court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A judgment of acquittal is appropriate under Rule 29 for insufficiency of the evidence only if, after reviewing the record in the light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence'") (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). The court will "presume that the jury

properly evaluated credibility of the witnesses, found the facts and drew rational inferences." *United States v. Iafelice*, 978 F.2d 92, 94 (3d Cir. 1992); *see also Smith*, 294 F.3d at 476 (in reviewing a Rule 29 motion, the court must "'draw all reasonable inferences'" in favor of the verdict) (quoting *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996)). The verdict will be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Iafelice,* 978 F.2d at 94.

An insufficiency finding should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). Thus, a defendant "challenging the sufficiency of the evidence bears a heavy burden," *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992), and must demonstrate "a complete failure of the prosecution to establish the essential elements" of the crime charged. *United States v. Lawrence,* 2009 WL 1918402, at *3 (D.V.I. July 1, 2009). It is "immaterial" that the evidence may permit a "less sinister conclusion" than the one the jury made. *Smith*, 294 F.3d at 478. "To sustain the jury's verdict, the evidence does not need to be inconsistent with every conclusion save that of guilt." *Id.*

Based on the application of these legal principles to the facts here, the Court concludes that Defendant's Motion for Acquittal must be denied.

### 2.   Analysis

#### a.   Aiding and Abetting

Defendant first argues that there was insufficient evidence showing that he acted as a principal—as opposed to an aider and abettor—in the commission of either the carjacking or robbery offense. (Dkt. No. 100 at 5). The Court rejects this argument.

A review of the language of the aiding and abetting statute reveals that the statutory text makes no distinction between the roles of principal and aider and abettor. The statute provides: "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a *principal*." 18 U.S.C. § 2(a) (emphasis added). In *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007), the Supreme Court explained that, during the course of the twentieth century, American jurisdictions eliminated the common law felony distinctions between principals and aiders and abettors. *Id.* at 189. The Court opined that "every jurisdiction—all States and the Federal Government—has 'expressly abrogated the distinction' among principals and aiders and abettors . . . ." *Id.* (quoting 2 W. LaFave, *Substantive Criminal Law* § 13.1(e), p. 333 (2d ed. 2003)); *see also United States v. Hodge*, 211 F.3d 74, 77 (3d Cir. 2000) ("18 U.S.C. § 2, the majority of cases, and the Model Penal Code, all take the view that an aider and abettor should be treated like any other principal, and be required to stand on his own two feet.") (internal quotation marks omitted).

To convict a person for aiding and abetting, "'the government must prove [beyond a reasonable doubt]': (1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission of the substantive offense and acted with intent to facilitate it.'" *United States v. Petersen*, 622 F.3d 196, 208 (3d Cir. 2010) (quoting *United States v. Soto*, 539 F.3d 191, 194 (3d Cir. 2008)). The Government must prove that the defendant "had the specific intent of facilitating the crime . . . mere knowledge of the underlying offense is not sufficient for conviction." *Id.* (quoting *Soto*, 539 F.3d at 194). Specific intent "requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing a specific and prohibited result." *Pierre v. Att'y Gen.*, 528 F.3d 180, 189 (3d Cir. 2008). "One can aid or abet another

through use of words or actions to promote the success of the illegal venture." *United States v. Mercado*, 610 F.3d 841, 846 (3d Cir. 2010).

### b.  Carjacking and First Degree Robbery

Defendant contends that the Court should enter a judgment of acquittal because insufficient evidence was presented to support a conviction under either the carjacking or first degree robbery charge. (Dkt. No. 100 at 8-12). Defendant raises two arguments in this regard. First, he asserts that "the evidence stops short of indicating that [he] participated in a crime in light of the victim's inability to make any connection between the perpetrator wearing a black wool jacket and [Defendant] wearing the same clothing when he was seen by Shamar in Catherine's Rest, or some other connection." (Dkt. No. 100 at 8). Second, Defendant claims that, even assuming that he was at the scene of the crime, there was no evidence showing that he had any intent to commit a crime, as he did not know the perpetrator had a gun. He asserts that he was merely present at the scene, and there was no evidence that he committed any act in furtherance of the crime. *Id.* at 8, 10.

Count One of the Indictment, the carjacking charge, provides:

On or about August 19, 2011, at St. Croix, in the District of the Virgin Islands, the defendants

KAREEM LOUIS and RAHEEM LOUIS,

while aiding and abetting each other, took a motor vehicle, a blue 2010 Jeep Compass 4x4 that had been transported, shipped and received in interstate commerce from [the] person and presence of, Miriam Euzebe by force, violence, and intimidation, with the intent to cause bodily harm, in violation of Title 18, United States Code, Section 2119(1).

(Dkt. No. 1 at 2).[1]

---

[1] The Indictment tracks the text of the carjacking statute, which provides:

Count Four of the Indictment, the first degree robbery charge, provides:

> On or about August 19, 2011, at St. Croix, in the District of the Virgin Islands, the defendants
>
> KAREEM LOUIS and RAHEEM LOUIS,
>
> while aiding and abetting each other, did take the personal property of Miriam Euzebe from her person and immediate presence by means of force and fear and against her will, with the intent to permanently deprive her thereof, and, in the course of the commission of the crime, displayed a firearm, in violation of Title 14, Virgin Islands Code, Section 1862(2).

(Dkt. No. 1 at 5).[2]

Viewed in the light most favorable to the Government, the evidence is more than sufficient to support Defendant's guilt beyond a reasonable doubt on both counts.

### i.    Defendant's Presence at the Scene

The Government presented sufficient circumstantial evidence for the jury to conclude that Defendant was the person wearing the black wool jacket at the scene of the crimes, and that

---

> Whoever, with the intent to cause death or serious bodily harm, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
>
> (1) be fined under this title or imprisoned not more than 15 years, or both.

18 U.S.C. § 2119(1).

[2] Robbery is defined as "the unlawful taking of personal property in the possession of another, from his person or immediate presence and against his will, by means of force or fear." 14 V.I.C. § 1861. The robbery first degree statute provides:

> A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another perpetrator of the crime: . . . (2) Displays, uses or threatens the use of a dangerous weapon.

14 V.I.C. § 1862(2).

he aided and abetted the carjacking and robbery. First, there is ample evidence connecting Defendant to the jacket, which would create a reasonable basis for the jury to infer that he was at the scene of the crimes. Ms. Schierloh testified that she saw two young men at the Flea Market on the morning of the carjacking, one of whom wore a dark blue or black wool jacket. She knew the man who requested the cigarette lived in the white concrete house next door, and she saw both men walking back toward the house. Officers Huertas and Benitez testified that the white concrete house was the residence of Kareem and Raheem Louis. A short time later, Ms. Schierloh saw the back of the person in the black wool jacket as he walked towards the Flea Market's delivery bay (the place where the carjacking took place), and then saw a car speed away from that area. Mrs. Euzebe stated that no one else, other than those two men, was around at the time of the incident. She told Mr. Martinez that two guys had just stolen her car. Shamar Browne testified that, when he saw Defendant on the morning of the carjacking, Defendant was wearing a black wool jacket. He identified the jacket Defendant had been wearing from a photograph taken of the inside of the jeep after the police recovered the vehicle. Ms. Euzebe stated that the jacket did not belong to her, and she did not put it in the car. Given this evidence, the jury could reasonably infer that the person wearing the jacket immediately before the commission of the crime, and who was observed walking toward the delivery bay where the carjacking took place, was Defendant.

Moreover, it is well-established that, on a Rule 29 motion, evidence should not be viewed in a vacuum but in relation to the totality of the evidence elicited in a case. *See United States v. Pavulak*, 700 F.3d 651, 668 (3d Cir. 2012) (in reviewing a sufficiency of evidence claim, courts "examine the totality of the evidence, both direct and circumstantial, and interpret the evidence in the light most favorable to the government as the verdict winner."). Thus, when the evidence

10

regarding the black wool jacket and its connection with Defendant is viewed in the context of additional evidence produced by the Government, there is further support for the jury's reasonable inference that Defendant participated in the crimes.

It is undisputed that Defendant and his brother Kareem—who Ms. Euzebe identified as the man who pointed the gun at her—were in possession of the jeep later on the same morning that the crimes were committed. Defendant was identified as driving the jeep by Officer Huertas, and Shamar and Oshean Browne. He fled the supermarket in the jeep when the police officers closed in. Officer Cedano stated that when the VIPD officers next saw the jeep, they were led on a high-speed chase before it was abandoned. The jury could reasonably infer that Defendant was driving the jeep during that chase. Courts have long held that efforts to flee the authorities indicate a consciousness of guilt. *See Eley v. Erickson*, __ F.3d __, 2013 WL 1405923, at *19 (3d Cir. Apr. 9, 2013) ("Flight may indicate consciousness of guilt and may be considered as evidence, along with other proof, supporting an inference of guilt.").

Further, Ms. Euzebe testified that she left her Apple i-Phone in the car, which looked like the i-Phone found on Defendant when Officer Benitez arrested him. Defendant told Officer Benitez that the phone belonged to "the owner of the vehicle which they stole, the blue Compass." (Dkt. No. 93 at 131, 134). The jury could reasonably infer that the word "they" in that sentence meant "we"—Defendant and his brother Kareem—and indicated that Defendant knew not only that more than one person had stolen the car, but also its make and color. Finally, Defendant told his younger brother Shamar that he and his girlfriend "patched" the money together to buy the car, when he obviously did not do so—allowing the jury to reasonably infer that Defendant was attempting to cover up the crimes.

Based on the totality of the evidence, the jury could reasonably infer that Defendant was the man in the black wool jacket at the scene of the crimes and the person who was standing directly behind Kareem when the carjacking and robbery took place.

### ii.    The Requisite Intent

Defendant also posits that, even assuming that he was the second individual involved in the incident, there was no evidence of his intent to commit a crime or that he knew the perpetrator had a gun and would use it, because all he did was to "walk up with the first individual to the victim. . . . [He] said nothing or did nothing other than stand behind the perpetrator." (Dkt. No. 100 at 8). According to Defendant, his "mere presence" at the location of a crime is insufficient to convict him, and the Government did not show that he committed any act in furtherance of the crimes. *Id.* By this argument, Defendant challenges the intent element of aiding and abetting: he disputes that he had "the specific intent of facilitating the crime[s]." *Petersen*, 622 F.3d at 208.

The intent required under the carjacking statute "is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile[,] the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car[.]" *Holloway v. United States*, 526 U.S. 1, 12 (1999). The intent element of robbery first degree is satisfied if the evidence shows that the perpetrator had the intent to permanently deprive the victim of her personal property. *Gov't of V.I. v. Baron*, 2006 WL 3842110, at *5 (V.I. Super. Oct. 23, 2006). As an aider and abettor in both crimes, Defendant would have to share Kareem's intent to cause serious bodily harm to Ms. Euzebe and to permanently deprive her of her property (the car).

The Third Circuit has

> emphasized that 'facilitation' for aiding and abetting purposes is more than associat[ion] with individuals involved in the criminal venture. Rather, the defendant must participate in the criminal enterprise. Neither mere presence at the scene of the crime nor mere knowledge of the crime is sufficient to support a conviction. Thus, to convict for aiding and abetting, the Government must prove the defendant associated himself with the venture and sought by his actions to make it succeed. The Government need only show some affirmative participation which, at least, encourages the principal offender to commit the offense. An aiding and abetting conviction can be supported solely with circumstantial evidence as long as there is a logical and convincing connection between the facts established and the conclusion inferred.

*Mercado*, 610 F.3d at 846 (citations and internal quotation marks omitted).

The evidence produced at trial is sufficient for a jury to reasonably conclude that: (1) Defendant was more than a mere spectator who happened to be present when the carjacking and robbery took place; and (2) he "associated himself with the venture and sought by his actions to make it succeed" by standing behind his brother, who pointed the firearm at Ms. Euzebe's forehead and demanded her car keys. *Id.* As a result of being threatened with the gun, Ms. Euzebe testified that she was in fear of her life. The jury could reasonably infer that Kareem intended to cause serious bodily harm to Ms. Euzebe because he pointed the gun at her, and it could further infer that he would have shot Ms. Euzebe had she failed to comply with his demand for her keys. *See United States v. Lake*, 150 F.3d 269, 272 (3d Cir. 1998) (evidence sufficient to support intent finding under carjacking statute where defendant placed a gun near the head of the victim and asked for her keys). Further, Kareem's intent to permanently deprive Ms. Euzebe of her personal property "can be reasonably inferred in that there was no testimony that [he] ever returned or attempted to return [Ms. Euzebe's property]." *Baron*, 2006 WL 3842110, at *5.

Defendant's intent, in turn, can be inferred by the fact that he was standing directly behind Kareem when the carjacking and robbery occurred, and he enjoyed access to the jeep

thereafter—riding in and driving the jeep, speeding off in response to a police order to stop, and taking police on a high speed chase (Dkt. No. 93 at 87)—thereby undercutting his argument that he was a mere spectator rather than an active participant in the carjacking and robbery. The jury could reasonably conclude from such evidence that Defendant was an active participant in the carjacking and the robbery, and acted with the requisite intent to facilitate the crimes. *See Davis v. Lafler*, 658 F.3d 525, 533 (6th Cir. 2011) (finding, *inter alia*, that defendant "fled the scene in the stolen vehicle. . . choos[ing] to enter the SUV that he had just seen his companion carjack," and concluding that defendant's continuous presence with the principal from the time that they arrived at the scene of the carjacking until they were caught stripping the SUV was "strong evidence of [defendant's] aiding and abetting the carjacking"); *United States v. Vallejos*, 421 F.3d 1119, 1125-26 (10th Cir. 2005) (sufficient evidence to establish requisite intent for aiding and abetting a carjacking where defendant stood within one foot of co-defendant as co-defendant brandished a firearm and ordered victim out of vehicle).

In a non-precedential, albeit informative ruling, the Third Circuit in *United States v. Holmes*, 387 F. App'x 242 (3d Cir. 2010), affirmed the conviction of Troy Holmes for aiding and abetting a carjacking and aiding and abetting the use and carrying of a firearm during a crime of violence. Holmes' companion, Melvin Browne, approached a man and his girlfriend who had just gotten out of a car, pointed a gun at the man, and told him to drop his money, car keys, and cell phone. Holmes stood next to Brown but never spoke. Shortly thereafter, the victim spotted Brown in the driver's seat of his car and Holmes seated next to him. After a short chase, both men were apprehended. A jury convicted Holmes, *inter alia*, of the two aiding and abetting counts. On appeal, Holmes posited that his "mere presence" at the scene was insufficient to support his aiding and abetting convictions. The Court rejected that argument, ruling that Holmes

"willingly accompanied Brown throughout the commission of the crime, and afterward." *Id.* at 245. In addition, Holmes' presence, particularly his "commanding size" (6 feet tall, 260 pounds), "likely amplified the threat that Brown presented to the victims." *Id.* The Court found that a jury could have made the reasonable and logical inference from the evidence presented that Holmes knew of the crime and acted with the intent to facilitate it. Although Holmes did not speak or carry a gun,

> his actions suggest a level of participation far greater than 'mere presence.' *See, e.g., United States v. Leon*, 739 F.2d 885, 893 (3d Cir. 1984) ("Although there may be innocent explanations consistent with these facts, we think that a reasonable jury could infer from these circumstances that [the defendant] was not present for some innocuous reason. . . .").

*Id.*

The scenario in *Holmes* is remarkably similar to the circumstances here. Defendant accompanied his brother and was standing directly behind him when he threatened Ms. Euzebe with the gun—adding to the intimidation factor. While the brothers were approximately five feet seven to five feet eight inches tall (Dkt. No. 63 at 87), which was not as menacing as Holmes' physique, they nevertheless towered over Ms. Euzebe—as she was only four feet nine inches tall—thereby "amplifying the threat" that Kareem presented with the gun. *Holmes,* 387 F. App'x at 245.[3] Defendant was later spotted next to his brother in the car. Based on the evidence, the jury could reasonably conclude that Defendant "willingly accompanied [Kareem] throughout the commission of the crime, and afterward"; that he was an active participant in the carjacking and the robbery; and that he acted with the requisite intent to facilitate the crimes. *Id.*

---

[3] The Court agrees with the observation of the Government that, "[a]t a minimum, Defendant stood behind his brother and entered the car thus providing psychological support to his brother." (Dkt. No. 102 at 9).

15

Because the evidence was sufficient to permit the jury to draw these inferences, it was adequate to ground its determination that Kareem and Defendant took the vehicle with the required mens rea. *See United States v. Taylor*, 226 F.3d 593, 597 (7th Cir. 2000) (a reasonable jury "could infer from the inherently violent character of carjackings that [defendant] either anticipated or knew that [the principal] was going to use a weapon."). Even if Defendant had been unaware that Kareem had a gun prior to the time of the carjacking, the jury could have reasonably inferred from the evidence that Defendant saw the gun Kareem used in the carjacking, and got into the car after the carjacking occurred—which shows that he was a participant who acted with the intent to facilitate the carjacking and robbery. *See Vallejos,* 421 F.3d at 1125 (where defendant and principal approached truck, principal pulled out gun, defendant, standing only about a foot behind him and slightly to the right, had clear line of vision to gun and jumped into truck, jury could find that defendant saw gun and had requisite intent to aid and abet carjacking); *Haugh v. Booker,* 210 F.3d 1147, 1151 (10th Cir. 2000) (inferring knowledge based on defendant's presence during his confederate's use of a firearm).

The Court concludes that the Government has offered substantial evidence to uphold Defendant's convictions on the aiding and abetting charges as they relate to carjacking pursuant to 18 U.S.C. § 2119(1) and robbery first degree pursuant to 14 V.I.C. § 1862(2). As noted above, a defendant "challenging the sufficiency of the evidence bears a heavy burden[,]" *Casper*, 956 F.2d at 421, and must demonstrate "a complete failure of the prosecution to establish the essential elements" of the crime charged. *Lawrence,* 2009 WL 1918402, at *3. Here, Defendant has not met this heavy burden, and his Motion for Judgment of Acquittal must be denied.

**B.  Motion for a New Trial**

Defendant characterized his motion for a new trial as one under Fed. R. Crim. P. 29(d), which provides: "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination." Fed. R. Crim. P. 29(d)(1). This Rule concerns a "conditional ruling on a motion for a new trial"; it is not the Rule under which motions for a new trial are brought. Fed. R. Crim. P. 29(d).

A motion for a new trial is properly made under Fed. R. Crim. P. 33(a), which provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence

> only if it "believes that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990)). Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case. *See United States v. Lacey*, 219 F.3d 779, 783-84 (8th Cir. 2000); *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). We review the denial of a Rule 33 motion for abuse of discretion. *United States v. Jasin*, 280 F.3d 355, 360 (3d Cir. 2002).

*United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Rule 33 requests for a new trial "are not favored and should be granted sparingly and only in exceptional cases." *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (citation omitted).

Defendant offers no argument that, based on the evidence, a miscarriage of justice has taken place, thereby failing to apprise the Court of the "serious danger that a miscarriage of justice ha[s] occurred." *Johnson*, 302 F.3d at 150. He simply argues insufficiency of the evidence

and seeks the alternative relief of a new trial. For the same reasons discussed in Section II(A)(2), *supra*, regarding the reasonable and logical inferences that can be drawn from the evidence presented, the Court—based on its independent assessment of the Government's case—does not believe that an innocent person has been convicted and finds that no miscarriage of justice has taken place. Accordingly, the Court will deny Defendant's Motion for a New Trial.

## **CONCLUSION**

For the reasons discussed above, the Court finds that Defendant is not entitled to a judgment of acquittal or a new trial. Accordingly, the Court will deny Defendant's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial. (Dkt. No. 100).

An appropriate Order accompanies this Memorandum Opinion.

Date: May 22, 2013             _____/s/_____
                                  WILMA A. LEWIS
                                  District Judge